The last case on this morning's docket is 09-64 Lanahan vs. Buenger Buenger It's pronounced Buenger? Buenger We have Mr. Bates here for Buenger. Is that right? Proceed, counsel. I guess somewhere along the way I learned that you started your argument with a little bit of humor. So I'll start with a really short story involving a friend of mine who owns a house in what she refers to as the little part of heaven. And they wanted to have a patio put on the back of their house. So the husband goes off to the home center and buys 10 square feet of patio blocks and starts to install them. And she comes home from her day's worth of activities. She's not happy at all, so she has them pull them up. The next day she's decided that she's going to go out there and she's going to take care of laying these patio blocks correctly. And after about working on it for 5, 6, 7 hours, she's not happy with them and she decides to pull them up. Well, about this point, the neighbor comes over and says, ma'am, are you going to take your patio in every night? Well, I use the story, of course, as an illustration that our homes are very unique to us. And that there's really nothing else that we have that helps us express who we are as persons like our homes. And the case that's before the court today involves, in many ways, a lifelong dream for the builders as it relates to the construction of their dream home. And while we might be willing to accept less than full performance as it relates to a commercial structure, a warehouse, even some things such as clothing or meals at restaurants, our houses are unique. And we're willing to spend a lot of time and effort to get our houses to be the kind of place that we have chosen for it to be. And the builders are an excellent example of how to do this correctly. They were not in a rush. They didn't run over to their local design store and say, give me one off the shelf. They spent a lot of time researching what it would take to build an energy efficient home in Illinois. They interviewed 5, 6, 7, 12 contractors at various times. They took bids from 4 or 5 different contractors. They went and explored with architects to see how they could build an energy efficient home. And finally decided upon a design in the arts and crafts style. They were very dedicated towards doing it right. They took every possible precaution they could take. And at the end of the day, they were less than satisfied with the result. After 9 years of litigation and a trial before Judge Duff, that same feeling of dissatisfaction still exists, which is of course why we're here today. As the court knows, we're complaining of 4 different errors in this case. I'd like to start with the second point of error first, even though I think they all deserve equal attention. I think we should start there. And that is our complaint that Mr. Lanahan and his company was provided full compensation without ever having to provide full performance. Judge Duff, in her order, found that Mr. Lanahan was entitled to be paid the full contract price. And it's a little mystifying as an attorney who deals in these kinds of cases and has done nothing but this type of work for the past 15, 16 years to understand how that decision came about. There are 3 reasons why that should not have happened. The first is the statutory reason, which is that Lanahan Construction never provided the Section 5 affidavit that showed that he had paid all the necessary subcontractors and material providers. This court, as well as the other fellow districts, deal a lot of their times dealing with mechanics lien cases. More so in the past year because of the economic crisis that we're all facing. And as people become more desperate, money starts to disappear. A recent case up in the, I think it's the second district, involving St. Francis Hospital and Accel Electric shows what happens when you make a full payment to a contractor in reliance that the ordinary thing will take place. In that situation, you've got the general contractor intended to pay the subcontractors an additional $160,000, but the bank liened the proceeds that were paid by the hospital. Nobody wanted that to happen, but Accel sued the hospital asking to be paid again, and the hospital became liable for that secondary bill. Properly so, because the procedures of the Mechanics Lien Act was not followed. So on that basis, the fact that Lanahan never provided that Section 5 affidavit, he should never have been awarded the balance of his contract. Second basis is that he never completed performance. There are multiple instances, as I've talked about on the record, where he didn't do the job that was required of him. For example, he modified much of the plans as it related to the construction of the house. Of great importance to us. Was there a walk-through punch list at the end? There was. One of the final pieces of correspondence between the parties, the lawyer and HUB, is a letter sent by the bankers to Mr. Lanahan in January of 2000 or 2001. I think it was 2001. Where the bankers said, look, this is what we're having problems with. If you'll come out here and resolve this, we'll pay you what we think we owe you, which I think at that time was about $24,000. This was after they took over occupancy? Occupancy took place in September or October of 2000. They moved in. At that point, the house could be occupied, clearly. I seem to remember in the briefs that there was a period of time prior to your clients taking over the possession that there was a walk-through and a punch list document or something. Most likely there would have been. I can't see it today to tell you. I specifically remember there being a formal punch list, but that would be typical. After they took over occupancy is when they became aware of the other problems? Well, the answer is yes and no. There were lots of problems that were seen before occupancy, but certainly additional problems. That would have been on the punch list, presumably, right? Yes, sir. So those problems are dealt with both before and after occupancy. That's an argument that Mr. Linehan advances in his brief is that because they moved into the home, that somehow there should be a stop in collecting on a breach of contract case. And as we've discussed in our brief, I don't think that's ever been the position of any owner in court anywhere. This isn't the same as buying a bad meal or getting a bad-fitting suit at a store. You don't have those options as homeowners. When you've invested everything that you have into a house, you either move in or you move in with your mother-in-law. And those are not acceptable options in almost every circumstance. So the fact that they moved in and took possession of the house was not because they thought everything was hunky-dory. It was because they had no other economic reality. They had to move in. They had mortgage payments that were accruing, and they could not afford to function other than in the home. The record will show that they were forced to move in and that they had, because of finances, they had no other way. I believe the testimony at trial will bear that up. They had sold their prior home and really had nowhere else to go. Also, the children were enrolled in the school district where the new house was located, and in order to get the kids to go to school, they had to move into the house. So the combination of factors will bear that up. I don't think there was really ever a choice for them. So, again, going back to the basic issue of did Lenahan complete the contract, the answer is I think there's lots of evidence he didn't. The workmanship issues have been laid out fairly well in the brief. I think the big issues are related to the use of fiberglass insulation in the home when the contract specifically required that it not be, because of allergen issues related to both Mrs. Bing and her son, Enoch. That wasn't discovered until after they moved in for some time. In fact, it was the home inspector, Nino Primavera, that discovered that fiberglass had been used throughout the house without the consent of permission. The use of the failure to use building wrap on the building, which was code required in Madison County at the time this house was constructed, required by the specifications of the contract, and a good building practice according to the manufacturer of the SIP panels, all indicate that this was another substantial breach of contract by Lenahan. You said it was or was not required by the county? Absolutely required by the county. BOCA? Madison County had adopted, at that time, the BOCA code. It's now known as the International Construction Code, the ICC. But it was required by the building code official at that point in time. The other things that we had discovered along the way was that the architect plans for the main structural support of the north side of the home, a 54-foot-long structural beam, had been modified by the contractor without consent from any engineer or any architect from a large engineered beam to two doubled-up 2x12s. To this day, no calculation has been performed by anyone that shows us that this is the equivalent of what was required in the specifications. This was hidden from the sight of the bingers at all times. There's no way that day's unsophisticated home buyers or home builders could have ever picked that up. That was a substantial savings to the Lenahan Construction Company that never resulted in the credit being issued to the bingers under any circumstances. Was this a bare beam or was it covered? No, this is, it's covered. It's located, if you look at the house, the orientation of the front of the house, this is the rear portion of the house. The beam extends from one side of the house to the other for a total length of 54 feet. Is it in the basement where you see it? No, this is on the first, between the first floor and the roof trusses. Okay. And it's located underneath sockets in part of the area, but it's also covered by drywall in the remaining parts of the home, including the bingers' master bedroom. It's especially important because the truss system that was used in this house was designed to bear on this beam. And while the wall of the bedroom does a fair amount of substantial support for this beam, the area outside of the house that makes up the patio is supported by what should have been six by six posts, five of them I believe, that would have helped bear this beam and the trusses on top of it. That plan got changed from five to four, and they were reduced from six by six beams to four by four posts. And one of those posts had no contact with the beam. It had been cut short. So we have photographs that are part of the record that show there's about a half-inch difference between the top of that beam and this doubled-up two-by-twelve, a very substantial concern that the architect admitted at trial. He said, this is something that contractors can make changes to my plans. He said, I agree that the design of a beam is best left to professionals as architects and engineers. The contractor himself admits there's no formal training as an architect or as an engineer. And that was not done with the permission of the homeowners? No, sir, not at all. There is some discussion about the truss design being changed with the consent of the homeowners, but not the structural beam that is so integral to the house. This becomes important later on, too, because as the biggers move to sell this house at some point in the future Do they still live there? They do at the current time, Joe. Is it on the market for sale? It is on the market, Joe. And how long has it been on the market? More than a year. It's hard to differentiate this, though. Is it because of the economic times or is it because of the disclosures that have to be made along with this house, which is what I'm getting at. The biggers have a duty under the Residential Real Property Disclosure Act to disclose the defects that they are now aware of in this house. And when I, as a home buyer, have an option between your house and your house and yours comes with a longer list of defects, it becomes that much harder to sell this piece of property. So these are additional concerns. Another concern I'll just mention briefly is the fact that the windows, which were high-grade Marvin windows, were installed in such a poor workmanship manner that they can't be opened and closed in a routine fashion. There's evidence at trial that shows that it takes a very muscular person considerable strength to lift these windows up in their tracks. You can't tilt them in without having to force them back into place. So the main function of these windows, which were designed for ease and comfort of the homeowner, for maintenance purposes, can't be utilized. The reason why they don't work is because the contractor used a high-expanding foam to insulate around these windows. It never should have taken place. Manufacturers said you're not supposed to use it, and it's clearly evident by the photographs and the testimony that's provided at trial. So we have defect after defect after defect. Change remains in the interior wall plans. They were placed incorrectly, causing changes in the way that things were laid out in the house. These are things that can't be repaired, but this is evidence of the type of problems that the Bingers had along the way the house was constructed. There's also concern about a mold claim. The house flooded, I think, not necessarily to anybody's fault, part of the risks of construction, but it became evident to Mr. Lanahan and his corporation that mold had developed in the basement components, the wooden components and the drywall components. His total remedy for this problem was to take some disinfectant and wipe off the surface of these molds, and off he goes and sells the houses to the Bingers. Soon afterwards, the Bingers were thinking of moving into this clean, efficient, pollutant-free home, discovered that, in fact, their home is infested with black mold, and they hire a company out of Alton, Illinois, to come in and do the testing. And sure enough, the house is a genuine mold infiltration problem. Never disclosed to us. And, in fact, if it had been disclosed to the Bingers, certainly would not have been... Was that then rectified, I guess? It has been resolved. A lot of the work has been... The moldy pieces have been removed and replaced. But there's always that concern. Again, as you sell this house, was that presented to the trial judge, the cost of the repair? Clay Marquis provided the information with regards to that, and the mold remediation specialist also talked about the need for continuing testing. So, yes, the trial court had that evidence as part of the trial. So, again, going back to the main point, you don't see how Mr. Lanahan and his company are entitled to be paid 100% of the damages, or 100% of the contract price, when they clearly haven't performed the contract. That leads us into the first point of error that I have, which is how does the court conclude that because my clients can't prove diminution of value, that they're entitled to no damages at all? Judge Duff has indicated in her order very clearly that because we didn't prove diminution of value, that my clients are not to recover anything. Well, that's not the law in the state of Illinois. The IPI clearly sets forth that when a jury is charged with destruction and determining damage to real property, they are to use the cost of repair, unless it is impractical or impossible to do so. What was your cost of repair? My cost of repair was about $100,000. And based upon the total contract price of what, $180,000? About $180,000, but that did not include the ground cost, Judge. Okay. Is that getting to be close to whether or not it's practical or not? I don't think so. And the reason why I say that is because in Falcon v. Loving-Cox, which this court decided in 1997, there the homeowners had bought a $220,000 home. The jury had awarded $200,000 in repair costs under the cost of repair, and this court found it to be perfectly reasonable to do so because there were so many different elements that needed repair that the entire structure could easily be saved. It made sense to proceed under a cost of repair mentality. I think the same is true here. When would it ever be not appropriate? I have two cases in mind. One is a case I have currently. The house is completely covered in brick. All four sides are brick, but the brick has defects in it. Almost every other brick has got a crack through it. The cost of repair on that house is about $30,000. The homeowners do not want to go through the aggravation of doing all their landscaping over again, possibly damaging the shell of their home underneath that brick. So we asked an appraiser to come in and evaluate the structure, disclosing the problem with the brick to a potential buyer. The appraiser said, based upon other situations, he would discount it about 10%. So in that situation, it makes sense to give a diminution of value because that's a more appropriate probable remedy than it is to simply remove all of the brick, deal with the consequences of that demolition and the reconstruction. What was considered under the $100,000? Did that include changing the size of the rooms? No, that does not include changing the walls. That's not practical to do. Okay, how about changing the beam? That does include changing the beam. And it does include the number of posts? It does include getting an engineer to come out and reevaluate what is actually necessary for the beam that's created there or for whatever replacement beam might actually be placed in that location. It also includes removing the fiberglass insulation and putting in proper insulation. A lot of trim work, replacing all of the windows that were inappropriately and inarticulately put in place. Was there any other testimony other than the experts you all hired, Mr. Primavera, is that his name? Mr. Primavera was not a repair expert. He was a licensed home inspector. He was the person that the fingers called in to say, can you tell me if there's anything else I'm missing here because I don't feel comfortable anymore. Clay Marquis is the fellow that comes in and says, using Mr. Primavera's punch list, this is what it's going to cost for us to repair this for you. Did the trial judge discount Mr. Primavera's testimony? The trial judge found that Mr. Primavera was very picky. At one point he talked about repairing part of a piece of wood. Did we give any deference to that finding? I think you have to give some deference to that finding if she used the right measure of damages. But because she's using diminution and not cost of repair, I think you have to ask yourself, does that evidence make sense in light of the cost of repair, and it doesn't. Clay Marquis' testimony. But if she said that his listed problems were too picky, then why would you want to have to repair little picky problems? Well, and I'll tell you exactly how it happened, Judge, is that Mr. Primavera is talking about a faucet that won't stop spinning on a handle. It won't stop spinning in a faucet in the master bedroom. And he says you have to take a screwdriver and tighten the screw. And after four hours of testimony from Mr. Primavera, Judge Duff kind of got frustrated and said, I know what you're talking about. I do that work myself all the time. Let's move on. And that was the only critical thing that was said of Mr. Primavera's testimony in the entire four hours of examination. What about the molding that had like a one-inch gap or half-inch gap? Oh, Judge. Where was this molding? There's several areas. There's baseball, baseboard molding. There's an area where the header on top of a door can be removed with your hand. It was never put in place. There's other moldings that have been put in with drywall screws instead of finish nails. And there's photographs as part of the record that demonstrate each of these conditions. These are difficult cases for anybody to listen to because it just takes so much time to review each photograph and explain where it is and why it's wrong. But when you see these photographs in the record, you have to say to yourself, this is not a luxury home. This is not the kind of house that I would want built for me. And it's not a house that the bidder should have accepted from anybody. These are not minor aesthetic concerns or changes. There are a couple of those in the testimony, admittedly. But these are major deviations from the contract. This was not – look, I've been with contractors who have built homes off of a napkin-drawn drawing. Okay? Thank you. You'll be able to respond. Justice, what you're being asked here to do is sit in and give a no vote hearing to a two-and-a-half-day trial. A question, Your Honor, on a punch list. December of 2000, my client went to the home and fulfilled the punch list. And you say, well, how do we know he fulfilled it? On January 7, 2001, Mr. Bates referred to this letter from his client, which is a C-150. Quote, and this is from his client, Now the house is completed. We are in position to address your final payment, payout. That's within less than 30 days of my client being there and doing the final payout. Next question is, the judge listened to the credibility for two-and-a-half days. An example they bring up here in their brief, they're talking about this five-to-four beam thing they're talking about. And, Justice Welch, if you look in the record, Mr. Bates' client is the one that changed it on the blueprints from five to four. It wasn't my client. You're not talking about the beam. You're talking about the post. The four posts versus the five posts, yes, sir. When you look at Judge, and they argue that she's not using the right standards. When you look at her decision on page two, she says, Very clearly in her decision, we don't have to try to guess what was in her mind, what she was applying the standards are. There's two standards, the diminishing value and the repair of the cost. She had those two in her mind. The next thing they come here, they didn't quite get to, is the argument on the mechanics lien. We filed a mechanics lien, or other counsel filed a mechanics lien. I tried the case, but I got into it very, very late. She found that the mechanics lien was improper. She found that for the statute awarded $2,500, the statutory, to the defendants in this case. Then it came to the attorney's views under the statute for filing a mechanics lien was improper. She awarded Mr. Bates his $2,500. He was in court proved dead. It was asked that he supply to us, to me as counsel for the plaintiff in this case, proof of other attorney's fees. I don't know if it was $500, $600, it was on both sides. Mr. Bates and I got to the picture. And it's on the record and very clearly cited in our brief. At that conclusion, I asked Mr. Bates to send me the back and front of the checks for these other attorney's fees that allegedly his client had paid. I stand here today. I still haven't received those checks. Backs or fronts. And I would have both. They're arguing that the judge should have okayed those attorney's fees. She cites it in her decision. Again, in very much detail here. She wasn't supported in any affidavits or anything. I haven't seen any breakdown on ours from other firms. Nothing like that. She allowed his $2,500. He asked for the $2,500 statutory. And the burden of proof is on them if they want additional attorney's fees from other counsel his client paid. And I think it's reasonable on my part to say all you have to send me is the back and front of the checks. I'll look at them and I'm not going to object to it. But as I said, to this day, it hasn't occurred yet. Now, as far as the mold, we're retrying the case again. The mold was the issue. There was a delivery to the house. Somebody accidentally cut off, it wasn't my client, it's not in the records of my client, took off the cords of the sump pump. There was water, there was blood. My client, when he saw it, cleaned it up. Appropriately cleaned it up. It's not something that he caused. He's not somebody here that's trying to take advantage of someone. He saw something and he tried to take care of it. It was caused by someone else and someone else should have taken care of the story. My client built a home. It was completed according to the January 7, 2001 letter from Mr. Bates' clients. The counterclaims. We went over those counterclaims. If you look at Mr. Bates' deposition where he sets out the witnesses, there's witnesses upon witnesses. This is not something that was done in two minutes or two days. It was two and a half days. The example brought up is the gentleman is sitting there testifying. He's testifying and testifying and testifying for, I don't know, two, three, four hours. And finally the judge looked at him and told him, and I think the record will reflect this. I can't go word for word. We're pretty close to it because it startled me. She looked at him and said, I do things like that. What you're describing in detail, he was given a list of things, it takes a screwdriver to straighten that out. He was trying to be puffed in the thing and she didn't take it. She questioned his credibility right then and there. She even says that full sitting, not directly, in her decision. Her decision is not a half a page or one line. It's one and three-quarters pages at least here. She's very clear on what standards she uses. She mentions the credibility problems that she has. She mentions the lack of proof that she wasn't provided. What the appellate here wants this court to do is sit and listen, reread everything, read the transcripts and everything. Because they don't ask to bring it back. They ask you to reverse it outright versus there's no other choice here. They've asked you to reverse it. Is there any disagreement about whether or not the windows were improperly installed? Yes, sir. So there was testimony on the other side of that? There's testimony that these windows there and there was people from Marvin Windows. Again, the name, I think it's Marvin. Marvin Windows, the factory came out and looked at her windows and stuff. It was a factory defect. There was a problem here of Mr. Bates' clients letting people in the house. Just to make sure I understand what you're saying, Marvin Windows said it was a factory defect? Yes, sir. Okay. They recall a bunch of those windows. Was that rectified then? Sir? Was that rectified or addressed? No, sir. It was not completely rectified because of… Well, how would your client be entitled to full payment then if there was some defect? Because of a warranty he gives that goes directly between the homeowner and the company themselves. In other words, that's something that, again, contract law in the sense of it runs between. Once he installs them, if the company comes back and says it's a defect, then it goes under the warranties where it goes under between. It's no third party. It's strictly between. They haven't made any efforts as far as you know? Once they admitted that, they wouldn't go out there and rectify it? No, I think there were efforts made, but I think those efforts were halted when people… What about the statement of opposing counsel that Madison County required at the time of construction that the building be wrapped? The question of wrapping is definitely in the record on this, too. My client was advised – this is, again, construction. The type of installation we're using to make it a green-type house was what they call a SIP. And what they did, they said, my client was advised, and it's in the record, that if he wrapped it, it would cause a moisture problem between the new installation stuff they put in and the wrap itself, and that could lead to mold. And he was advised not to do that for that reason. I've seen no violations, no codes. There's nothing in the record whatsoever to prove it was a violation of the code or a citation or anything written up whatsoever on the house. So nobody testified that a house wrap was required by the bulk code? No, sir, nobody did. My client testified that he did what he was instructed by the company that made it, not putting wrap because it would cause a moisture problem. So you disagree with the Postal Council's statement that Madison County, the time of construction required by, I assume, ordinance or whatever, that the building be wrapped? There's no judicial notice in the record. There's no violating anything in the record. Again, this is appellate court, not a court of first impression, and I'm assuming there's nothing in the record, no judicial notice, that it's not part of the record here. And on top of that, like I said, where's the write-up of the violation, the stop order, all that? I've seen none of that in this case. But it was required in the contract. House wrap. No, sir. So a house wrap's not in the contract. No. The main thing was they want the house green, okay? And by making it green, you put the wrap around it, it's going to cause mold. So my client makes the decision, they want that set.  In order to do that and do it properly, you couldn't wrap it because it would cause moisture, according to the manufacturer of the installation. Any testimony that this was discussed between the parties? The trial goes back two years. Well, in the record. In the record, you'll have to speak for yourself. This is something I'm not going to serve the court on purpose or anything. It's one of those things. It's been two years since March the trial was, and I just don't recall. Okay, did the contractsówell, we haven't read it yet. Did the contract specify the type of insulation? Yes, sir. What did it say? I think it keeps saying SIP. Cellulose sprayed in? No, it'sóI'm trying to think what SIP stands for. It's aó Structured Insulated Camp. Structured Insulated Camp. Those are kind of likeó Pre-made. Plywood on both sides with the beams with the foam in it or something? Right. It's pre-made on both sides. Is that how the walls were made? Yes, sir. They were notóbut they were pre-made with fiberglass instead, apparently. No, I don't believe the fiberglass was the wall. You said it was the attic. Okay, so it's just the attic, fiberglass. Yes, sir. Is that rolled in or sprayed in? I don't know, sir. It's not in the record. Is itóhas it got a specified R number? Yes, sir. That was another thing. So what was the specification? The specification by the U.S. Department of Energy was alló R-19? No, Your Honor. I think it was represented to be R-35. Okay, how many inches of fiberglass is R-35? Well, it wasn't fiberglass. It was a sieve. It was four inches of a sieve. But what did you put in fiberglass? Sir? I thought you said you put in fiberglass. No, sir. I said that Mr. Bateman, of course, used a fiberglass in the attic. There was no fiberglassó That's what I'm talking about. I'm not talking about the walls. I'm talking about the attic. Excuse me. 19 or 11 or what is it? There's nothing in the record to show that, Your Honor. Okay. Was the amount of fiberglass in inches equal to the amount required in the contract on the R-factor of the attic? There's nothing in the testimony or in the record to show it one way or the other, sir. When I was referring to the R-35, I thought you were talking about the walls. Walls. Well, that's an awful lot for a wall. Yes, sir. Are they 2x4s or 2x6s in the walls? What was specified? There's no testimony, sir, as to what type of 2x4s or 2x6s are placed in the wall. But there was a specification, any place, no fiberglass? I lost that point. There were discussions of no fiberglass. The contract would speak for itself. I don't think there was any testimony other than the defendant testifying. That's what she wanted because of her and one of her children's health problems. But somebody had no – was the contractor informed that there was not to be fiberglass? There's nothing in the record to that effect, sir, from the contractor's viewpoint. And as I stated earlier, what they want you to do, they're not happy with the result. They've appealed it and want you to sit on the credibility of the judge. And the court can do as it pleases. My concern is I think you just read the judge's order for the two-page or the page and three-quarters. It sets out the standards that she applied. It sets out the reasoning why she didn't see enough evidence presented or evidence at all presented. It sets out her credibility issues. It's very clear from the decision. It's not something that you have to guess or read between the lines of why she did what she did. And we believe to support her decision 100%. We didn't win everything. We didn't lose everything. It's one of these things that the appellate is unsatisfied with the result of the defective bill. Thank you. Any rebuttal, counsel? Hopefully I can provide a couple of the conditions you're looking for, Judge. The contract document prepared by Mr. Linehan talks about two-by-four walls and two-by-sixes in the ceilings. It talks about R30 in the ceiling, blown-in insulation. What was found was actually rolled-backs that were R30. And those were up in the attic space, of course, that would not be visible to the ordinary homeowner unless they were to crawl up there and look around, which is not something you would do as a new homeowner, typically. The issue of insulation was clearly specified in the communications between my client and Mr. Linehan. He admits so at trial. The blueprints prepared by Mitch Henson have specific status on them. There has been no fiberglass used in this house. And the contract talks about being in compliance with those blueprints and specifications provided by the architect. And was there a price figured for removing the fiberglass and putting in the other type of insulation? Mr. Marquis, on his Testified to that? It's in the record. That's what I want to know. I think it's exhibit number 60 is the information from Mr. Marquis. Counsel, is there any significance to the fact that, the way I remember it, the counterclaim filed on behalf of your clients was filed about 20 months after they took occupancy? Should there be any significance to that, why there's a 20-month delay in bringing their suit? I think the answer is there shouldn't be any legal significance to it. Is there some practical significance? I think the first is that Mrs. Binger is a paralegal with a firm in Edwardsville and knows that litigation generally is distasteful. So she was trying to bring this to resolution without having to spend the thousands of dollars necessary. Okay. I think that's probably the best answer I can give you. The other thing that you guys will see from the record that is provided is that most of the seven years prior to trial were spent with discovery disputes with Mr. Lenahan's counsel. This was unbelievable as far as the procedures that took for us to get here. Mr. Walker has been an excellent colleague to work with in this case, so this is not chargeable to Mr. Walker in any way, shape, or form. But the question that has to come back down to is who bears the risk of noncompliance with the contract? The way that Judge Duff decided this case is that the homeowner bore the risk, that somehow the homeowner's at fault for not getting the house that she asked for, the house that she designed, the house that she put her heart and soul into. The contractor, who made all these decisions on his own, as he admits time and time again, for example, this Beam situation he talks about, not discussing it with the Bingers, the house wrap, not discussing it with the Bingers. And by the way, he admits to that during the trial itself. It's in volume one. But all of these things take place. He decides to change these things, doesn't bother to get a change order, doesn't bother to protect his own company, essentially.  She's built one so far in her whole life and will probably never build another, as you might well imagine. Mr. Lannigan is in the business of building homes. It is his duty, it's his responsibility, he is charged with the responsibility of making sure this thing goes forward. That's what the Illinois Consumer Fraud and Deceptive Practice Act requires of business people, that you conduct yourself in a manner that is not fraudulent and not deceptive. That's the third point of argument here, obviously, is did the court down below make an error in not considering the consumer fraud? And I point you to Falcon again. At what point does the Court of Appeals realize that the legislature intends for people to be protected from this kind of behavior? I mean, if you have somebody who uses this much effort to get it done correctly and still can't get it done, and the contractor gets to walk away with full payment, you know, what if we just told people that they're going to make the single biggest investment of their life? That's what the consumer fraud was designed to supplement. This is not the law in Illinois. We protect consumers. You could make the same argument for almost any breach of contract. You could, Judge, but the difference is that when you talk about an investment of this size, you can't recover when things go wrong. I mean, people stretch to buy the biggest and the best house they can get. You don't stretch to buy a suit. You don't even stretch that much to buy a new car. You know, convenient monthly payments. You know, after five years, you paint the thing off, and you go on and get your next car. But a house is forever. It's more than a diamond ring. And when you talk about the health issue,